Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★

# MEMORANDUM OPINION

No. 04-08-00014-CR

Jose **ROMERO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-9123B
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:      Karen Angelini, Justice
              Rebecca Simmons, Justice
              Steven C. Hilbig, Justice

Delivered and Filed:   February 25, 2009

AFFIRMED

Jose Romero appeals his conviction of injury to a child.  Romero contends the evidence is legally and factually insufficient to support the jury's finding that he either: (1) intentionally or knowingly injured the child; or (2) intentionally or knowingly caused injury to the child by omission by either: (A) not preventing the child from being abused; or (B) failing to obtain medical care.  We affirm the trial court's judgment.

**BACKGROUND**

Jose Antonio Romero III ("Baby Tony") was seven weeks old when he died of massive head and internal injuries. The appellant, Romero, was Baby Tony's father, and Gina Hernandez was Baby Tony's mother. Gina sometimes resided with Baby Tony and his sister, Jalene, at the home of Gina's aunt, Mary Gamez. Gamez's mother, Gamez's son Joseph, and Gamez's sister Anita (Gina's mother) also resided with Gamez. Gina also sometimes resided with Romero, Jalene, and Baby Tony at the home of Romero's father, Jose Romero, Sr. ("Romero, Sr."). Romero's half brother, Jose Antonio Romero, Jr. ("Joey"), resided in a converted garden shed behind Romero, Sr.'s home.

The night before Baby Tony died, Romero, Gina, Jalene and Baby Tony had slept at Gamez's house. Gamez and Gina primarily took care of Baby Tony when they stayed at Gamez's house. Gamez testified that she changed Baby Tony's diapers but never saw any bruises. Gamez testified that she never saw Romero change Baby Tony's diaper. Gamez testified that Baby Tony was fine when Romero, Gina, Jalene, and Baby Tony left the following day around 5:30 or 6:00 p.m.

Gamez's son, Joseph, was fourteen years old at the time of the trial which occurred approximately two years after Baby Tony died. At trial, Joseph testified that on the day that Baby Tony died, Gamez, Gina, and Romero were all taking care of Baby Tony, and he was fine. Two months after Baby Tony died, however, Joseph testified before a grand jury. In that testimony, Joseph stated that Romero tapped Baby Tony's cheek when Baby Tony was crying. Joseph further stated that it surprised him when Romero tapped Baby Tony, and he told the grand jury that it makes him mad when people hit babies. Joseph demonstrated the tapping for the jury, stating it was not a punch or slap.

Romero, Sr. testified that Romero and Gina had a rocky relationship. Gina would sometimes leave with the babies and would sometimes leave Baby Tony alone with Romero for a few days. On the day Baby Tony died, Romero, Sr. drove Romero, Gina, Jalene, and Baby Tony from Gamez's house to his home. Romero, Sr. was dozing when he heard somebody say, "he's not breathing." Romero, Sr. testified that Romero had removed Baby Tony's clothes to give him CPR. Romero, Sr. told Romero and Gina to move Baby Tony to the living room sofa because the bedroom was hot. Romero, Sr. then called 911. Romero, Sr. stated that he never saw any bruises on Baby Tony, but he also testified that he did not change Baby Tony's diapers and never saw him without a shirt.

Billy Washburn, a San Antonio paramedic, was dispatched for a full arrest on an infant at 8:05 p.m. When he arrived, the fire fighters brought Baby Tony to the ambulance. Baby Tony was clinically dead, meaning he had no pulse, no respiration, no pressure. Baby Tony had petechiae, a condition where blood comes to the surface because the underlying organs have been damaged so that blood is leaking into the surrounding tissue. Washburn testified that CPR would not have caused Baby Tony's bruising or petechiae.

Detective Leslie Wayne Spiess was called to the hospital where the nurses explained Baby Tony's injuries to him. During Detective Spiess's testimony, pictures depicting Baby Tony's injuries were introduced into evidence. Detective Spiess testified that when he questioned the family members present, the family was "taking a we-don't-know kind of attitude."

Officer Raul Zuniga and another officer drove Romero and Joey to the police station to take their statements. Officer Zuniga was unaware of the reason Romero and Joey were being taken in for questioning; however, neither asked Officer Zuniga about Baby Tony.

Dr. Santos Cantu, Jr. was the emergency room doctor who tried to resuscitate Baby Tony, who was dead on arrival. Dr. Cantu testified that it was obvious that Baby Tony was abused. Baby Tony had bruises all over his abdomen and chest and a retinal hemorrhage that is almost always caused by shaking the baby. Baby Tony also had a distended abdomen, which was a sign of internal trauma. Dr. Cantu testified that Baby Tony's bruises could not have been caused by CPR. Baby Tony also had sustained multiple rib fractures from different periods of times, which Dr. Cantu testified would require a lot of force because a baby's bones are more pliable.

Detective Gilbert Gonzalez took Romero's statement at the police station. Romero's statement was played for the jury. The jury was able to observe Romero's body language and his lack of eye contact during the interview in which Romero repeatedly professed that he did not know what happened. Romero stated that he and Gina fed Baby Tony and laid him on the bed because he fell asleep. Romero stated that they checked on him because they had not heard him for awhile. When they checked on him, Baby Tony did not respond, and his eyes were rolled back. Romero denied that he did not want to call 911. Approximately one hour into his interview, Romero mentioned that he had left Baby Tony for a short period of time with a little boy from the neighborhood who belonged to the East Terrace Gang. Romero did not know the little boy's name. Romero stated that he left Baby Tony with the little boy so he could get some movies he had loaned to his friend Roger. Gina was in the shower when he let the little boy in and when he returned.

Dr. Kimberly Molina, a medical examiner, testified regarding Baby Tony's autopsy. Baby Tony suffered both a subdural and subarachnoid hemorrhage of the brain caused by blunt force trauma to his head that occurred sometime within 12 to 24 hours before his death. Baby Tony had multiple bruises on his chest, upper and lower abdomen, and both sides, which also likely occurred

-4-

sometime within 12 to 24 hours before his death. Baby Tony's spleen was torn, and his liver was torn in half. About two-thirds of Baby Tony's blood was in his abdomen, indicating an injury that occurred between minutes to one and one-half hours before his death. Dr. Molina testified that a baby with these type of injuries would not feed well and would be crying. Baby Tony also had multiple rib fractures, some of which he likely suffered approximately three to six weeks before his death and some of which he likely suffered within twenty-four hours of his death. Dr. Molina said some but not all of Baby Tony's bruising could possibly have been caused by CPR, but not the internal injuries.

Jack Nabors, an emergency medical technician, was the first to arrive at Romero, Sr.'s house in response to the 911 call. He took Baby Tony from Romero and twice asked what caused Baby Tony to stop breathing. No one responded to his questions. Nabors asked for a towel to put Baby Tony on the floor. Once Nabors placed Baby Tony on the floor, he again asked what happened in a stern manner because no one was responding. Romero, who was kneeling next to Nabors, said, "I didn't do anything." Romero then started crying.

Joey testified that he knocked on the front door of Romero, Sr.'s house around 7:30 p.m. to tell Romero to come to the back so he could tell him about a job possibility. Romero said he would come in fifteen minutes, but he did not. Joey then heard the sirens and saw Baby Tony being taken to the ambulance.

Mary Romero testified that some time after Baby Tony died she was at a restaurant and saw Gamez eating with her son Joseph and Gina's baby niece. The baby was crying, and Joseph swung at her. Mary Romero heard Gamez tell Joseph to leave the baby alone, to which he responded, "She don't f—ing let me eat."

Jose DeLeon, Romero's cousin, testified that he talked to Romero outside his home earlier in the evening before the ambulances arrived. According to DeLeon, Romero was on his way back from Roger's where Romero went to get his Play Station. DeLeon went outside again when he heard the sirens and asked Romero what happened. Romero told DeLeon that the baby could not breathe. DeLeon testified that Romero was in shock and crying.

Roger Robles lived behind Romero, Sr.'s home. Robles testified that Romero came to his house around 7:30 p.m. to get some games and movies that Romero had loaned Robles. Robles initially stated that he did "not really" remember which day this occurred. In response to whether this happened the day Baby Tony died, Robles responded, "I – I think." Robles admitted that he belonged to a gang. Robles stated that a member of the East Terrace Gang would not be living in their neighborhood. Robles's grandmother also testified that Romero came to her home to pick up his Play Station around 7:30 p.m. and that she later heard an ambulance around 8:00 p.m.

Dr. Rod Lee, an orthopedic surgeon, testified that Baby Tony had three sets of rib fractures. One set of fractures occurred four to six weeks before his death. The second set of fractures occurred about two weeks before his death. The third set of fractures occurred on or about the day Baby Tony died. Dr. Lee also testified that Baby Tony's bruises were one or two days old. Dr. Lee further testified that Baby Tony's brain and internal injuries could have occurred anywhere from a few minutes to a few hours before his death, but could not have been older then twelve to twenty-four hours; however, Dr. Lee believed Baby Tony probably died within twenty minutes from the abdominal injury. Dr. Lee stated Baby Tony could not have fed normally after the abdominal injury. Dr. Lee opined that Baby Tony was probably chronically abused the majority of his life.

Detective Manuel Nunez was assigned to investigate Baby Tony's death. Detective Nunez reviewed the interviews of both Romero and Gina and went to speak with Gina who was in jail. After reviewing the interviews, Detective Nunez was satisfied that Romero never left the house to speak to a Roger on the night Baby Tony died.

### STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007). In conducting a factual sufficiency review, this court views all of the evidence in a neutral light and sets aside the verdict only if: (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In reviewing the factual sufficiency of the evidence, we "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence alone is sufficient to establish guilt." *Id*. "Furthermore, the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Id*. Finally, "when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." *Id*.

In his discussion of the standard of review, Romero asserts that "[i]n a circumstantial evidence case, the State is not required to prove that the circumstances presented exclude every hypothesis that the criminal act may have been committed by another, it must exclude only every reasonably hypothesis raised by the evidence that would tend to exculpate the accused." Romero cites *Brandley v. State*, 691 S.W.2d 699 (Tex. Crim. App. 1985), in support of this assertion. The Texas Court of Criminal Appeals, however, rejected this alternative hypothesis test in 1991. *See Geesa v. State*, 820 S.W.2d 154, 156 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000); *Jennings v. State*, 107 S.W.3d 85, 89 (Tex. App.—San Antonio 2003, no pet.); *see also Bautista v. State*, No. 13-01-327-CR, 2003 WL 22019419, at *4 (Tex. App.—Corpus Christi Aug. 27, 2003, no pet.) (citing *Brandley* as applying alternative hypothesis test) (not designated for publication). "While alternative hypotheses may be a factor in conducting a factual sufficiency review, [the Texas Court of Criminal Appeals has] never held that the old outstanding reasonable hypothesis test must be satisfied for the evidence to be factually sufficient." *Goodman v. State*, 66 S.W.3d 283, 298 n.16 (Tex. Crim. App. 2001) (Keller, P.J., concurring). "[I]t is a jury, not a reviewing court, that accepts or rejects reasonably equal competing theories of causation." *Goodman,* 66 S.W.3d at 287.

### DISCUSSION

Romero challenges the legal and factual sufficiency of the evidence, asserting there is no evidence or insufficient evidence that he was the person who injured Baby Tony. Although Romero offers various other possibilities, as previously noted, the State was not required to exclude every reasonable hypothesis. *See Geesa*, 820 S.W.2d at 156. The jury was free to accept or reject reasonably equal competing theories of who injured Baby Tony. *See Goodman*, 66 S.W.3d at 287.

In this case, evidence was presented from which the jury could have determined that Romero injured Baby Tony. Based on the medical testimony regarding the timing of the injuries, the jury could have found that the only two people possibly responsible for Baby Tony's injuries were Romero and Gina. Furthermore, the jury could have believed Romero injured Baby Tony based on his statement to Nabors that he "didn't do anything wrong." The jury also was able to observe Romero's demeanor during his interview and could take into consideration his responses, his body language, and his lack of eye contact. The jury also could have taken into consideration Romero's efforts to exonerate himself by suggesting, over one hour into his interview, that he left Baby Tony in the care of a little boy from the East Terrace Gang while he went to Roger's house to get movies he had loaned him. Although Romero introduced testimony from Roger Robles, Robles's grandmother, and DeLeon in an effort to support this theory, the jury could disbelieve their testimony based on: (1) conflicts in the testimony of those witnesses; (2) Joey's testimony that Romero was home at 7:30 on the night Baby Tony died; (3) Robles's testimony that an East Terrace Gang member would not live in their neighborhood; and (4) Detective Nunez's testimony that based on his investigation, he was satisfied that Romero had not left the house that evening. Finally, the jury could take into consideration Joseph's testimony regarding Romero "tapping" Baby Tony on his cheek when he cried followed by Joseph's statement that it makes him mad when people hit babies. It was within the jury's province to assess Joseph's credibility in light of the testimony that he had subsequently taken a swing at a baby in a restaurant. *See Lancon*, 253 S.W.3d at 704-05.

Having reviewed the record as a whole, we conclude that some evidence was presented from which the jury could find that Romero injured Baby Tony, and such a finding is not against the great weight and preponderance of the evidence. Finally, the evidence supporting a finding that Romero

injured Baby Tony is not so weak that the jury's verdict is clearly wrong and manifestly unjust. Because the evidence was sufficient for the jury to convict Romero under the theory that Romero intentionally or knowingly injured Baby Tony, we need not address the sufficiency of the evidence to support the State's other theories. *See Guevara,* 152 S.W.3d at 49.

## CONCLUSION

The trial court's judgment is affirmed.

Karen Angelini, Justice

DO NOT PUBLISH